UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-----------------------------------------------------
                                   :

ERIN O'DONNELL, *et al.*,         :
                                   :

          Plaintiffs,       :          CASE NO. 1:14-CV-2612
                                   :

          v.                 :
                                   :         OPINION & ORDER

CITY OF CLEVELAND, *et al.*,   :
                                 :         [Resolving Doc. 53]

          Defendants.       :
                                   :
-----------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

      Officers Erin O'Donnell, Wilfredo Diaz, Christopher Ereg, Michael Farley, Cynthia Moore, Michael Rinkus, William Salupo, Brian Sabolik, and Scott Sistek ("Plaintiffs") work as police officers with the Cleveland Police Department. In this case, the Plaintiff Officers sue the City of Cleveland, Michael McGrath, Martin Flask, Calvin Williams, and Frank Jackson ("Defendants").[1]

      After a high-speed chase, each Plaintiff fired their guns at two unarmed citizens.  Both citizens died.  Consistent with long-standing Cleveland policies, the Plaintiffs were placed in a restricted paid work status after the citizens were killed.  With this lawsuit, the Plaintiffs say that their restricted duty time was longer than the restricted duty periods imposed upon black police officers who had similarly killed suspects. Plaintiffs make three claims: (1) Race Discrimination;

---
[1] Doc. 1. This Court dismissed Frank Jackson as a Defendant. Doc. 51.

Case No. 1:14-CV-2612
Gwin, J.

(2) Civil Rights Violation; and (3) Breach of Employment Contract.

Defendants move for summary judgment.[2] For the reasons that follow, the Court

**GRANTS** Defendants' motion for summary judgment.

## I. Factual Background

*A) November 29, 2012 police pursuit and shooting death of Timothy Russell and Malissa Williams*

On November 29, 2012, Plaintiffs worked as City of Cleveland plain-clothes and

uniformed police officers.  On that day, Plaintiffs participated in a late-night police chase that

ended with the killing of Timothy Russell and Malissa Williams. Russell drove the vehicle

involved in the chase. Williams was a passenger.  Both Russell and Williams were unarmed.[3] It

understates to say that the 62 police car chase resulted in widespread publicity and criticism.

Other police officers began pursuing the Russell vehicle after hearing a loud sudden

noise they believed could have been gunshots fired from the vehicle. A backfiring car engine

likely caused the noise.  No firearm casings were found in Russell's vehicle or at the location

where "shots" were heard.  No firearm was ever found in Russell's vehicle.  No discarded

firearm was ever found along the chase route.[4]

At least 62 police vehicles chased Russell's vehicle for 25 minutes. Marked and

unmarked city, county and highway patrol cars chased the Russell vehicle.[5]

In 2012, Cleveland had more than 100 murders and more than 470 shootings.  At some

early period in the chase, police obtained the license plate of the vehicle being chased.  Against

---

[2]Doc. 53.
[3]Doc. 54-1.
[4]*Id.*
[5]*Id.*

Case No. 1:14-CV-2612
Gwin, J.

that backdrop, little explains why 62 police cars would chase a vehicle where, at worst, a

gunshot type sound had come from the vehicle.

The pursuit ended in a middle school parking lot in East Cleveland.  As recreated by the

Ohio Bureau of Criminal Identification's report, Russell drove into the dead-end school staff

parking lot.  Pursuing police officers filled the only exit from the parking lot.

After his vehicle was bumped by a pursuing police officer, Russell's vehicle came to rest

on an island.  The police driver who had bumped Russell into the island then exited his police

vehicle and fired at Russell.  Russell's vehicle then drove off the island towards the only parking

lot exit but police vehicles blocked Russell's vehicle from leaving through the parking lot access

road.  Both before and after Russell's vehicle became wedged into police vehicles, the Plaintiff

Police Officers fired large volleys of shots into Russell and Williams.[6]

In that parking lot, Russell and Williams never fired any weapon. And no police officers

were injured, which is surprising given the number of police who were firing at Russell's vehicle

from every direction.  Although seemingly boxed by police cars, Plaintiffs and four other police

officers fired 137 shots at Russell and Williams while Russell and Williams were in their vehicle

in the unoccupied East Cleveland parking lot. Plaintiffs or other police shot Russell 23 times and

shot Williams 24 times. Predictably, both Russell and Williams died at the scene.[7]

Both Russell and Williams were African-American. Thirteen officers shot at Russell and

Williams.   Twelve of the shooting officers were white.  One shooting officer was Hispanic. Of

the Plaintiffs, eight are white and one is Hispanic. The Russell and Williams police killings

---

[6] *Id.*
[7] *Id.*

-3-

Case No. 1:14-CV-2612
Gwin, J.

received significant media attention.

> B) *Restricted duty assignment following the November 29, 2012 police killing of Timothy Russell and Malissa Williams*

According to Cleveland Police Department Policy No. 1.1.38, Traumatic Incident Protocol, officers involved in shootings are ordered to serve at least a 45 day period in the "gymnasium" unless the shooting officer or the stress consultant request more time.[8] Feeling aggrieved that they lost overtime pay and outside guard employment after Russell and Williams were killed, Plaintiffs sue.  Plaintiffs say they were discriminatorily assigned to longer periods of restricted duty because they are not black.

Before the November 29, 2012, Russell and Williams shootings, the Division of Police's Use of Deadly Force Investigative Team ("UDFIT") typically investigated use of deadly force incidents. However, at the request of the City of East Cleveland, the Ohio Bureau of Criminal Investigation ("BCI") investigated the  November 29, 2012 incident.[9]

Then Police Chief Michael McGrath testified that he ordered that the Plaintiffs be placed in restricted-duty status until the criminal investigation surrounding their actions was finished.[10] McGrath testified that he did not want Plaintiffs involved in street patrol that might involve Plaintiffs in another use of deadly force incident.[11]

Plaintiffs were ordered to the "gymnasium," an assignment that is referred to as a type of "Restricted Duty."[12] While on restricted duty, officers cannot work overtime, cannot work

---

[8] Doc. 54-13.
[9] Doc. 53-2.
[10] *Id.*
[11] Doc. 57-1 at 32.
[12] Doc. 54-14.

-4-

Case No. 1:14-CV-2612
Gwin, J.

secondary outside employment, and cannot get paid for court appearances.

Then Police Chief McGrath put Plaintiffs on restricted duty status near December 3, 2012.[13] In February 2013, BCI released its investigative report. The County Prosecutor then began his review. On June 3, 2013 all of the Plaintiffs returned to full duty except for Plaintiff Rinkus who returned on July 1, 2013. Plaintiffs remained on full duty until October 24, 2013 when then Police Chief McGrath returned them to restricted duty.[14]

Police Chief McGrath testified that there was a misunderstanding with regard to the June 2013 order that returned Plaintiffs to front line duty. McGrath says he had ordered Plaintiffs to go to transitional duty in non-front-line positions.[15] Chief McGrath testified that when he learned Plaintiffs had been placed in full-duty front-line positions, he ordered that they return to transitional and restricted duty.[16]

In May 2014, the Cuyahoga County Grand Jury declined to issue criminal charges against the Plaintiff Officers. On June 13, 2014, new Police Chief Calvin Williams returned the Plaintiffs to regular duty status.[17]

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[18] The moving party must first demonstrate that there is an absence of a genuine dispute as

---

[13]/Doc. 54-2 through Doc. 54-10.
[14]/*Id.*
[15]/Doc. 57-1 at 43-57.
[16]/*Id.*
[17]/Doc. 53-2.
[18]/*Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. Pro. 56(a)).

-5-

Case No. 1:14-CV-2612
Gwin, J.

to a material fact entitling it to judgment.[19]  Once the moving party has done so, the non-moving party must set forth specific facts in the record—not its allegations or denials in pleadings—showing a triable issue.[20] The  Court views the facts and all reasonable inferences from those facts in favor of the non-moving party.[21] The existence of some doubt as to the material facts is insufficient to defeat a motion for summary judgment.[22] The moving party's initial burden does not require it to produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[23] Furthermore, the court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact."[24] Rather, the burden falls on the non-moving party to designate specific facts or evidence in dispute.[25]

### III. Discussion

#### A. Reverse Discrimination Claim

Plaintiffs allege reverse discrimination in violation of 42 U.S.C §1981, 42 U.S.C. §2000e-2 (Title VII), and Ohio Rev. Code §4112.02(A). Plaintiffs are white.  Police Chief McGrath is white.

#### 1. Defendants' argument that Plaintiffs failed to exhaust administrative remedies

---

[19]/*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[20]/*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[21]/*Killion*, 761 F.3d at 580 (internal citation omitted).
[22]/*Id.* at 586.
[23]/*Celotex Corp.*, 477 U.S. at 325.
[24]/*Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).
[25]/*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Case No. 1:14-CV-2612
Gwin, J.

In responding to Plaintiffs' Title VII claim, Defendants argue that Plaintiffs did not make a timely charge with the United States Equal Employment Opportunities Commission ("EEOC") and are thus precluded from pursuing a Title VII action.[26] Responding, Plaintiffs admit that they did not file any EEOC charges and acknowledge that this failure to file a charge with the EEOC stops their federal Title VII claim. While acknowledging that their Title VII claim has been forfeited, Plaintiffs say they can nevertheless bring similar claims under Ohio R.C. §4112.02 and under 42 U.S.C. §1981.

Because Plaintiffs failed to timely make Title VII charges to the EEOC, Plaintiffs' Title VII claim is dismissed for failure to exhaust administrative remedies.

Plaintiffs' §1981 claim is also dismissed under Sixth Circuit precedent holding that "the express cause of action for damages created by §1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in §1981 by state governmental units."[27] Because §1983 is the exclusive mechanism to vindicate violations of §1981, a §1981 claim companion to a §1983 claim must be dismissed.[28] Plaintiffs brought a §1983 claim, so this Court dismisses Plaintiffs' §1981 claim.

However, the Ohio state law reverse discrimination claim under R.C. §4112.02 remains. As to this state law claim, Defendants say Ohio stops such claims when there is a collective bargaining agreement that allow Plaintiffs to grieve Cleveland's actions. Defendants say Plaintiffs work under a collective bargaining agreement that gives Plaintiffs a right to grieve their duty assignments and also stops outside lawsuits for claims that can be grieved.

---

[26] *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555 n.4 (1977) (collecting citations).
[27] *Arendale v. City of Memphis*, 519 F.3d 587, 599 (6th Cir. 2008) quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989).
[28] *Wallace v. MetroHealth Sys.*, 2013 WL 5739705, at *9 (N.D. Ohio Oct. 22, 2013) (collecting citations).

Case No. 1:14-CV-2612
Gwin, J.

The Ohio Supreme Court has stated that "[a]n employee or employee's agent who bargains with an employer relinquishes certain rights to obtain other benefits. Therefore, an employee who has entered into an employment contract *may* give up the right to immediately file a civil action for discrimination in a court and instead agree to appeal to a civil service commission or other administrative agency."[29/] However, Ohio courts have also found that "contractual collective-bargaining rights are distinct from statutory rights"[30/] and that "[a]ny agreement in a collective bargaining agreement to arbitrate a statutory claim . . . must be 'clear and unmistakable.'"[31/]

Here, the collective bargaining agreement, while mentioning that the employer may not discriminate, does not contain a clear and unmistakable agreement to arbitrate statutory claims. This Court declines to dismiss the state law discrimination claim for failure to exhaust mediation and grievance remedies that are given by the collective bargaining agreement.

   *2. Reverse discrimination under R.C. §4112.02*

Turning to the merits of the R.C. §4112.02 claim, the Court finds that Defendants are entitled to summary judgment.

Ohio R.C. § 4112.02, discrimination claims  are analyzed under the Title VII framework.[32/]  Under that Title VII framework, a plaintiff can prove a case of reverse discrimination by (1) offering direct evidence that race was a substantial factor in the employment decision, or by (2) offering circumstantial evidence of discrimination.[33/] "Direct

---

[29/] *Dworning v. Euclid*, 892 N.E.2d, 420, 428 (Ohio 2008)  (emphasis added).
[30/] *Haynes v. Ohio Tpk. Comm.*, 893 N.E.2d 850, 853 (Ohio Ct. App. 2008).
[31/] *Id.*
[32/] *Dewsv. A.B. Dick Co.*, 231 F.3d 1016, 1020 n.2 (6th Cir. 2000).
[33/] *Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir. 2000).

-8-

Case No. 1:14-CV-2612
Gwin, J.

evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."[34] Put in other words, "direct evidence is evidence that proves the existence of a fact without requiring any inferences."[35]

If the plaintiff presents direct evidence of discrimination, the burden shifts to the defendant to show that it would have taken the adverse employment action absent any discriminatory motive.[36]

In the alternative to using direct evidence to prove a discriminatory intent, a Plaintiff claiming reverse discrimination under R.C. § 4112.02, can offer circumstantial evidence of discrimination using the *McDonnell Douglas* burden-shifting paradigm.[37] Under this standard, the plaintiff must provide circumstantial evidence from which a jury could draw an inference of discrimination.[38] However, "mere personal belief, conjecture and speculation are insufficient to support an inference of . . . discrimination."[39]

The plaintiff bears the burden of establishing a prima facie case of discrimination by the employer with proof he (1) is a member of a protected group; (2) was subject to an adverse employment decision; (3) was qualified for the position; and (4) was replaced by a person outside of the protected class.[40]

The Sixth Circuit has adapted this four-pronged test to cases of reverse discrimination.

---

[34]*Id.* at 522.

[35]*Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004).

[36]*Id.*

[37]*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S.792 (1973)).

[38]*Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 561 (6th Cir. 2004).

[39]*Grizzell v. City of Columbus*, 461 F.3d 711, 724 (6th Cir. 2006) ; (quoting *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997)).

[40]*Id.*

Case No. 1:14-CV-2612
Gwin, J.

> In reverse discrimination cases, the first prong of the *McDonnell Douglas*
> standard has been interpreted to allow a majority plaintiff to establish a *prima
> facie* case of intentionally disparate treatment when 'background circumstances
> support the suspicion that the defendant is that unusual employer who
> discriminates against the majority.' The remaining elements of the test are
> modified to reflect the requirement that the plaintiff demonstrate he was treated
> differently than other similarly situated employees who were not members of the
> protected group.[41/]

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to

articulate a legitimate, non-discriminatory reason for the adverse employment action.[42/] If that

burden is met, the burden of production shifts back to the plaintiff to demonstrate that the

proffered reason is a pretext.[43/]

This Court finds that Plaintiffs fail the reverse discrimination inquiry. This Court will

address each step of the inquiry in turn.

### a. Plaintiffs do not offer any direct evidence of discrimination.

As an initial matter, Plaintiffs have not presented any direct evidence of discrimination.

In claiming that they have offered direct evidence, Plaintiffs misunderstand what constitutes

direct evidence. They argue that a jury verdict in a 2001 case and a judge's decision to allow a

2008 case to go beyond summary judgment are direct evidence in this case. Both the 2001 and

2008 cases involved challenges to the length of white police officers' restrictive duty after they

shot black individuals. Alternatively, Plaintiffs claim that certain testimony in the 2008 case is

direct evidence in this 2014 case.

The 2001 jury verdict is rather obviously not direct evidence in this case. Different

shooting, different justification for the shooting; different supervisors; and different decision

---

[41/]*Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).

[42/]*Burdine*, 450 U.S. at 253.

[43/]*Id.*

-10-

Case No. 1:14-CV-2612
Gwin, J.

makers.  The 2008 decision to allow a reverse discrimination case to go beyond summary judgment is even less relevant.  Different shooting, different justification for the shooting; and only an interim ruling allowing a case to go beyond summary judgment.  Finally, the testimony in the 2008 case proves little to nothing.  Especially since it dealt with 2008 circumstances; not the 2012 circumstances involved with this case.

The Sixth Circuit has stated, "rarely can discriminatory intent be ascertained through direct evidence because rarely is such evidence available."[44] Examples of direct evidence of racial animus include racial slurs made by a manager, a school principal's expressed concern that a "white presence" be maintained in the school, and affidavits of restaurant employees who had overheard the owners of the restaurant making disparaging and racist remarks about black people.[45]

This is not one of those "rare" cases where there is "direct evidence from the lips of the defendant proclaiming . . . his racial animus."[46] And it is illogic that Police Chief McGrath, who was either totally or principally responsible for Plaintiffs' duty assignment and who is white, would say that white police officers need stricter discipline after those officers shoot citizens.

Plaintiffs show no evidence of any direct proclamation of racial animus against whites by any of the Defendants. Instead, Plaintiffs point to short excerpts from dated testimony in unrelated cases that consist of individuals giving general discussion about race and the City of Cleveland.

Plaintiffs offer the testimony of three Cleveland Police officers who were involved in an

---

[44] *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).

[45] *Talley v. BravoPitino Rest.*, 61 F.3d 1241, 1248-49 (6th Cir. 1995).

[46] *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir.1998).

-11-

Case No. 1:14-CV-2612
Gwin, J.

earlier, separate 2008 case. The testimony of Deputy Chief Hennessy,[47] Lt. McHugh,[48] and

officer James DeSimone[49] is not direct evidence in this case. And independent of not being

admissible direct evidence in this case, the Hennessy, McHugh and DeSimone testimony gives

no support for the inference that white Police Chief McGrath discriminated against the white

Plaintiff officers because of their race.

      The 2008 and 2009 Hennessy, McHugh and DeSimone testimonies were given years

before the restricted duty given in this case.  The expert opinions in the *Franko* case were

similarly from the 2008 and 2009 time period.  Neither is direct evidence or relevant

circumstantial evidence in this case.

      More importantly, this Court struggles to find anything indicative of direct evidence of

discrimination in the McHugh, Simone, or Hennessy testimony excerpts.  Police Lieutenant

McHugh supervised the gymnasium in 2008.  In the 2008 *Franko* case, he testified that three

white officers who were "involved in the most unrest and racial concerns in the community and

racial issues also spent the most amount of time on restricted duty in the gym."[50] This innocuous

statement was not direct evidence in the *Franko* case and is obviously not direct evidence in this

case.

      Plaintiffs also say that the 2008 *Franko* case testimony from Deputy Chief Hennessy

should be considered as direct evidence in this case.  Obviously not.  But even if it could be

considered, the Hennessy testimony helps Defendants; it does not help the Plaintiffs.

      For example, Deputy Chief Hennessy gave 2008 testimony that:

---

[47]/Doc. 54-18.
[48]/Doc. 54-19.
[49]/Doc. 54-17.
[50]/Doc. 54-19 at 52.

Case No. 1:14-CV-2612
Gwin, J.

> Q.   But you're watching them, right? I'm not asking you -- I'm just asking you as your observations, you would agree with me that many shootings in the City of Cleveland because of racial tensions are prolonged indefinitely because of political reasons, correct?
>
> A.   I think the investigations take a long time, but not being an investigator I can't tell you exactly why.
>
> Q.   I'm not suggesting the UDFIT investigation is prolonged politically, what I'm asking you, can't you agree with me that on racially high profile and high tension cases involving white officers and black suspects you have seen long delays coming out of the chief prosecutor's office in ruling on those shootings, correct?
>
> A.   *I've seen long delays on all the shootings. I'm not sure. I mean, Officer Gulley is a black officer, shot a black suspect and his ruling didn't come out until Officer Franko's also.* [51/]

Hennessy also testified that he sought to have the *Franko* officers returned to normal duty but Franko was not returned immediately to normal duty.[52/]

Police Officer Simone's *Franko* case testimony  gives even less direct evidence. Plaintiffs offer one page from Simone's 2008 *Franko* case testimony that "it's obvious that the investigations from the very beginning are focused on satisfying the media and the [minority] people that are involved."[53/] Simone's testimony speaks to investigations, not to restricted duty. And Simone's testimony was likely incompetent in the *Franko* case[54/] and has no relevance to this case.

The preliminary opinions of Lt. Col. Johnson[55/] and Dr. Melvin Ott[56/] also do not give

---

[51/]Doc. 54-18 at 75 (Emphasis added).

[52/]*Id*. at 97.

[53/]Doc. 54-17 at 30.

[54/]Under Evidence Rule 602, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Federal Evidence Rule 602

[55/]Doc.54-22.

[56/]Doc. 54-23.

Case No. 1:14-CV-2612
Gwin, J.

direct evidence.  Instead, they give opinion evidence.

> *b. Plaintiffs do not establish that Defendants are that unusual employer who discriminates against the majority.*

Because Plaintiffs have not offered any direct evidence, this Court turns to Plaintiffs' efforts to prove their case by circumstantial evidence. "In reverse discrimination cases, the first prong of the *McDonnell Douglas* standard has been interpreted to allow a majority plaintiff to establish a prima facie case of intentionally disparate treatment when 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'"[57] Plaintiffs do not satisfy this burden.

Plaintiffs again point to the *Franko* case and claim that the threshold burden was met in that case on "evidence nearly identical as to that in this case."[58] *Franko*, of course, is a district court decision, not a Sixth Circuit decision.  *Franko's* legal discussion is considered but gives no controlling authority for this case.  More importantly, *Franko's* factual discussion involved different decisions and different factual backgrounds.

Plaintiffs' comparisons to the *Franko* case are misguided. Similar to this case, Franko challenged the length of his restricted duty status.  However, in challenging the length of restricted duty, Franko testified that he had received a voicemail from then Mayor Campbell while Franko was on restricted duty where former Mayor Campbell allegedly told Franko that his restricted duty status was tied to the elections.[59]

Plaintiffs have pointed to no evidence even remotely similar to the *Franko* voicemail.

---

[57] *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (collecting citations).

[58] Doc. 54.

[59] Franko testified: "Mayor Campbell called, she said she was calling to see how I was doing. She said that I was in the eye of the storm at the time. It was more about the elections than about me right now, seeing that my shooting was a couple days before the primaries." *Franko v. City of Cleveland*, 654 F. Supp. 2d 711, 718 (N.D. Ohio 2009).

Case No. 1:14-CV-2612
Gwin, J.

*Franko* differs from this case for a number of reasons. *Franko* involved a 2005-2006 restricted

duty status officer serving under a different mayor and different police chief. *Franko* also

involved a police shooting that was completely different from this case. On September 30, 2005,

Franko fatally shot Laray Renshaw, an African-American individual, after pursuing Renshaw for

resisting arrest. Renshaw allegedly punched Franko in the face a number of times and then

allegedly attempted to grab Franko's gun.[60] Franko remained in restricted duty for

approximately 8 months.

Second, the *Franko* court relied heavily on a jury verdict that found the City of Cleveland

intentionally discriminated against Edward Lentz, a Caucasian police officer, by virtue of an

almost two-year reassignment to gym duty pending investigation for use of deadly force against

an African American individual.[61] Lentz was assigned to the gymnasium in 2001. On December

6, 2001, Lentz shot fourteen rounds at a vehicle then twelve-year old Lorenzo Locklear was

driving, leading to Locklear sustaining a number of gunshot wounds. Unlike Russell and

Williams, Locklear survived the shooting.[62] Lentz spent approximately 21 months in restricted

duty. Lentz's reassignment involved a different incident and happened over a decade before

Plaintiffs' incident, and under a different mayoral administration. The Lentz incident did not

result in the killing of two unarmed individuals, and Lentz spent 21 months in restricted duty

compared to Plaintiffs' 16 month restricted duty status.

The *Franko* case involved different evidence, different parties, and is not direct or

---

[60] Doc. 1 in *Franko v. Cleveland*, Case No. 1:07CV547 (ND Ohio).

[61] *Edward P. Lentz v. City of Cleveland*, No. 1:04CV669 (N.D. Ohio 2004).

[62] Doc. 71 in *Edward P. Lentz v. City of Cleveland*, No. 1:04CV669 (N.D. Ohio 2004). Further, "on February 5, 2003, Lentz was charged with felonious assault and a misdemeanor charge for providing false information to the UDF investigation team. On April 2, 2003, the grand jury returned an indictment on the misdemeanor falsification charge, but not the felonious assault charge. On July 27, 2003, after the state presented its case, the Cuyahoga Court of Common Pleas judge dismissed the misdemeanor charge on a Rule 29 motion."

Case No. 1:14-CV-2612
Gwin, J.

indirect  evidence of a reverse discrimination motive in this case.

> *c. Plaintiffs' proffered statistical data does not establish a prima facie case.*

Plaintiffs present statistical police disciplinary data that does not meet Plaintiffs' burden to establish a prima facie case. "Statistics standing virtually alone are improper vehicles to prove discrimination."[63] Further, "a plaintiff must do more than merely point to race and proclaim: 'Aha! Discrimination.'"[64]

Plaintiffs' entire claim seems to rest on such a proclamation. Plaintiffs say they offer statistical support that non-African-American officers spent longer periods on restricted duty compared to African-American officers.[65]  Plaintiffs did not offer any statistical analysis beyond the raw numbers. "Statistical evidence which fails to take into account nondiscriminatory explanations does not permit an inference of discrimination."[66]

Here, the statistical evidence does not take into account any possible explanation other than an immediate accusation of racism. For example, the calculations include all twelve officers involved in the shooting of Russell and Williams, weighting the average without taking into account how this particular circumstance was unique.

Finally, the preliminary expert opinions of Johnson and Ott do not suffice to establish that Defendants fall in the unusual case of discriminating against the majority. The opinions were conclusory in nature and not based on any type of personal knowledge about the employment decisions at hand. Ott's statistical analysis did not take into account the ways in

---

[63] *Hosick v. Chicago State Univ. Bd. of Trustees*, 924 F. Supp. 2d 956, 969 (N.D. Ill. 2013).

[64] *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 829 (7th Cir. 2006).

[65] Plaintiffs offer calculations they say show that between March 2007 and November 2012, white officers spent an average of 239.38 days on restricted duty while African-American officers spent an average of 79.42 days on restricted duty.

[66] *Radue v. Kimberly Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).

Case No. 1:14-CV-2612
Gwin, J.

which white and African American officers were not similarly situated.

Thus, this Court concludes that Plaintiffs were not able to establish background circumstances sufficient to meet their burden in proving that Defendants discriminate against the majority. Nevertheless, even if Plaintiffs had been able to meet that burden, their reverse racism claim would still fail at the subsequent steps of the inquiry, as explained below.

> *d.  Plaintiffs' offer of circumstantial evidence is insufficient to support an inference that Defendants gave longer restrictive duty assignments because Plaintiffs were white.*

> *(I). Standard for making a circumstantial showing of discrimination*

Plaintiffs argue that circumstantial evidence supports finding discriminatory treatment. For Plaintiffs to make a circumstantial showing of discrimination treatment, Plaintiffs must show that the comparable white officers were treated differently and the comparables are similarly situated in "all respects."[67/] There does not have to be an exact correlation between Plaintiffs and the comparison employees, but they must be the same in all relevant respects.[68/]

Further, to make this assessment, a court must look to

> certain factors, such as whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.[69/]

The conduct must be of "comparable seriousness" or "similar in kind and severity."[70/] In practical terms, two employees are not similarly situated in all relevant respects "if there is a meaningful distinction between them that explains their employer's different treatment of

---

[67/] *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002).

[68/] *Id.*

[69/] *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

[70/] *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

Case No. 1:14-CV-2612
Gwin, J.
them."[71]

Plaintiffs fail to show that similarly situated black officers received different treatment. When relying upon circumstantial evidence, Title VII plaintiffs typically identify a similar officer involved in the same conduct with the same supervisor who the employer treated differently.  When the officer's race is the only distinguishing factor, a plaintiff can support an inference that the employee's race motivated the different treatment.

In opposing summary judgment, Plaintiffs make no effort to identify black officers who engaged in similar conduct but received less restricted duty time.  Instead, Plaintiffs say that Cleveland has an overall pattern of giving less restrictive duty to black officers who shoot and kill suspects than Cleveland gives to white officers who shoot and kill suspects.

> (ii). Plaintiffs' statistics do not prove a "pattern or practice" of racial discrimination.

However, under pattern and practice analysis, Plaintiffs' evidence is again insufficient. Under the Supreme Court's *International Brotherhood of Teamsters v. United States*[72], plaintiffs may prove pattern and practice claims using a combination of statistical and anecdotal evidence to show that discrimination is a defendant's standard operating procedure.  But statistical evidence is closely examined before it is admissible, especially in areas where discretion is given.[73]

Plaintiffs identify 34 white officers who were put on restricted duty after the death of black suspects.  Thirteen of those 34 white officers were involved with the Timothy Russell and Malissa Williams deaths.  Plaintiffs identify seven black police officers who were put on

---

[71]/*Koski v. Willowwood Care Ctr. of Brunswick, Inc.*, 158 Ohio App. 3d 248, 252 (2004) citing to *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998).

[72]/431 U.S. at 336-38.

[73]/*McCleskey v. Kemp*, 481 U.S. 279, 297  (1987).

-18-

Case No. 1:14-CV-2612
Gwin, J.
restricted duty after the death of a black suspect.

Plaintiffs suggest that their white race is associated with longer restricted duty assignments. But the length of restricted duty assignment is overwhelmingly affected by the police officer shooting circumstances. Sometimes the police officer's justification is obvious; other times it is not. Both within white officer restricted duty periods and black officer restricted duty periods wide variances occur between incidents. While restricted duty periods vary widely between incidents, restricted duty periods are nearly identical for all officers involved in each incident.[74] In limited samples, association usually fails when heterogeneous statistical material is used.

Plaintiffs argue that Cleveland imposed an "average" 239 days restricted duty on white officers involved in fatal police shootings but 79 days on black police officers involved with fatal police shootings. But this average is skewed by the fourteen officers involved with this November 29, 2012, incident, far more officers than were involved in any other shooting death.

Almost always, Cleveland assigns the same restricted duty to all officers involved in a police suspect killing. For example, after a March 13, 2012, police shooting that resulted in a suspect's death, Cleveland assigned two black officers and two white officers to restricted duty. Each served 62 or 63 days on restricted duty.[75] The broad majority of all police shooting deaths resulted in all involved officers serving similar restricted duty periods. The Russell and Williams deaths involved an inordinate number of officers and skews the mean.

---

[74]For example, four officers (two white and two black) were involved with a March 13, 2012, suspect killing. Each received restricted duty of 62 or 63 days. Two white officers were involved with a January 20, 2011, suspect death. One received 62 restrictive duty days; the other received 77 days. For white officers assigned to restricted duty for suspect deaths other than the Russell and Williams deaths, periods vary significantly and include 63 days, 63 days, 168 days, 152 days, 217 days, 55 days, 166 days, 64 days, 62 days, 77 days, 99 days, 165 days, 48 days, 63 days, 145 days, 145 days, and 145 days. Cleveland similarly assigned black officers to significantly varying periods after suspect deaths, including assignments of 62 days, 62 days, 89 days, 156 days, 117 days, 62 days, and 8 days.

[75]UDF Report 12-05.

-19-

Case No. 1:14-CV-2612
Gwin, J.

Typically, using the median rather than the mean better lessens the effect of outliers.[76] If we use median rather than mean, and weighted each incident equally, the number of days on restricted leave for white officers involved in fatal incidents falls to 107 or 99 if the November 29, 2012, shooting is not used.  After shooting deaths, black officers received a mean 80 day restricted duty period and a 71 day median restricted duty period..

With the small data set, and with the unusually large restricted duty period associated with the Russell and Williams deaths, the median gives a better indication of whether black or white restrictive duty periods are significantly different.[77]

As described by the *Teamsters* Court: "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances."[78]   That the restricted duty assignments vary widely strongly suggests that the shooting death circumstances dominate the restricted duty period decision.   "Confidence in the appropriateness of an extrapolation cannot come from the experiment itself. It comes from knowledge about outside factors that would or would not affect the outcome."[79]

Plaintiffs suggest a correlation between an officer's race and the restricted duty given the officer after a suspect death.  Plaintiffs statistical evidence is insufficient to raise material issues that would support finding that Plaintiffs were assigned to longer periods of restricted duty because of their race.

---

[76] *See generally* Timothy C. Urdan, *Statistics in Plain English* 10 (2005) ("[F]or the same reason that the mean and median are useful, they can often be dangerous if we forget that a statistic such as the mean ignores a lot of information about the distribution, including the great amount of variety that exists in many distributions.").

[77] *Reference Manual on Scientific Evidence, Third Edition* (2011), Federal Judicial Center, 238.

[78] *International  Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 (1977).

[79] *Reference Manual on Scientific Evidence, Third Edition* (2011), Federal Judicial Center,  223.

-20-

Case No. 1:14-CV-2612
Gwin, J.

With few exceptions, Cleveland consistently assigned similar restricted duty for all officers involved in each suspect death.  And Cleveland assigned significantly different restricted duty periods between different suspect deaths.

*(iii). Plaintiffs were not similarly situated to officers in other restricted duty cases*

This Court agrees that "looking merely at the time these officers were on restricted duty does not establish that they were similarly-situated."[80] Plaintiffs received restrictive duty after the high-profile chase and deaths Russell and Williams.  Neither Russell or Williams had firearms.  Thirteen Cleveland police officers shot at Russell and Williams.  Cleveland police officers shot more than 130 rounds.

The high-profile nature of the November 29, 2012, incident highlights how Plaintiffs were not similarly situated to other officers sent to the gym in other deadly force cases.

A minimum of 62 police vehicles engaged in a 25 minute pursuit of the Russell vehicle. Thirteen police officers fired one hundred and thirty-seven shots at the Russell vehicle. Russell was shot twenty-three times while Williams was shot twenty-four times.  Both Russell and Williams were unarmed and no weapon was ever recovered in connection with the pursuit.

Plaintiffs say a white police chief discriminated against them because of their race when that white police chief gave Plaintiffs longer than usual restricted duty assignment. But Plaintiffs do not identify any similarly situated black officer being given less restricted duty time after an incident remotely resembling the Plaintiffs' shooting circumstances.[81]

---

[80] Doc. 53 at 15.

[81] In their complaint (Doc. 1), Plaintiffs reference Officer Johnson, an African American officer who made a traffic stop and brief pursuit of Russell and Williams earlier on the day of the incident. Officer Johnson was not similarly situated because he did not use deadly force on the day in question.  Officer Johnson's different conduct reinforces how questionable Plaintiffs' conduct had been.  After stopping Russell and after Russell accelerated away, Officer Johnson did not engage in a long, high speed chase that put other motorists at risk and did not shoot at Edwards or Williams that could have put other officers at risk of being shot in the cross-fire.

Case No. 1:14-CV-2612
Gwin, J.

Plaintiffs repeatedly point to the justifiably heightened media attention surrounding the incident and the fact that media outlets noted the race of Russell, Williams and the police officers involved.  The heightened media attention reinforces that this incident was unique and that Plaintiffs have failed to identify a similarly situated black police.

Finally, the City of East Cleveland requested that the Ohio Bureau of Criminal Investigation conduct an investigation of the incident, and the Cuyahoga County Prosecutor then reviewed BCI's investigation to determine whether criminal charges were appropriate. Plaintiffs do not identify any black officers involved in use of deadly force incidents with unarmed civilians that included similar prosecutor review.

*e. Adverse employment action.*

To establish an adverse employment action, a plaintiff must identify a materially adverse change with respect to the terms and conditions of his employment.[82] To determine whether an employment action is materially adverse, the Sixth circuit focuses on five factors: (1) significant changes in responsibility; (2) decreased salary; (3) less distinguished title; (4) material loss in benefits; and (5) other indices that might be unique to a particular situation.[83]

"Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decision."[84] The reassignment must be more than a mere inconvenience.[85] However, if the conditions of the reassignment would be objectively intolerable to a reasonable person and thereby amount to a constructive discharge, then it is considered materially

---

[82] *Kocsis v. Multi Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (collecting citations).
[83] *Id.*
[84] *Id.*
[85] *Id.*

Case No. 1:14-CV-2612
Gwin, J.

adverse.[86]/ Adverse employment actions are discharges, demotions, refusals to hire, refusals to

promote, and reprimands.[87]/ "Transfers can constitute adverse employment actions if they are

sufficiently punitive . . . or if the new job is markedly less prestigious and less interesting than

the old one."[88]/

     Police Chief McGrath assigned Plaintiffs to restricted duty.  Plaintiffs were not demoted,

their titles were not changed, their salaries did not change, and their benefits remained the same.

The "gymnasium" assignment, however, stopped Plaintiffs from certain overtime pay and

stopped Plaintiffs from certain outside employment assignments.

     In arguing that their long gymnasium assignment would be objectively intolerable to a

reasonable person, Plaintiffs rely upon a district court decision in the 2008 *Franko* case. *Franko*

was settled and dismissed without Sixth Circuit review.[89]/ The *Franko* court denied summary

judgment  and found that the Franko Plaintiff made a sufficient showing of an adverse

employment action to escape summary judgment.  This Court is not controlled by the *Franko*

decision. The *Franko* case consisted of different evidence, different police officer conduct and

no final judgment.[90]/

     Plaintiffs did not endure discharge, demotion, refusal to hire, refusal to promote, or

reprimand. While they were on restricted duty, the officers had some of the following

---

[86]/ *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001).

[87]/ *Franko v. City of Cleveland*, 654 F. Supp.2d 711 (N.D. Ohio 2009) (citing *Pierce v. Tex. Dep't of Criminal Justice, Institutional Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994)).

[88]/ *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) citing  *Click v. Copeland*, 970 F.2d 106, 108 (5th Cir. 1992)).

[89]/ *Franko v. City of Cleveland*, 654 F.Supp.2d 711 (2009).

[90]/ Under Federal Civil Rule 54 (b), "[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Case No. 1:14-CV-2612
Gwin, J.

assignments: reporting to the gymnasium; working inside one of the five police district buildings; and reporting to the CPD impound lot.[91]

The Plaintiffs did not receive overtime, but overtime is not guaranteed under the Collective Bargaining Agreement ("CBA").[92] Plaintiffs received their salary and benefits.

The Sixth Circuit has found that a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action.[93]

This case presents a close question whether Plaintiffs' restricted duty sufficiently changes the terms of employment to be an adverse action., The restricted duty prevented the officers from working overtime or secondary employment. Plaintiffs claim they received substantial overtime compensation and potentially substantial outside employment income.  Because Plaintiffs fail at every other step of the reverse racism inquiry, this Court does not reach the question of whether Plaintiffs suffered an adverse employment action.

> *f. Defendants offer a legitimate non-discriminatory reason for its actions and Plaintiffs failed to show Defendants non-discriminatory explanation was pretextual.*

Plaintiffs fail to show a prima facie reverse discrimination case. However, even if they had shown evidence establishing a prima facie case, they would not survive summary judgment on their reverse discrimination claim.

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.[94] The defendant need not prove a non-discriminatory reason for its actions, but only articulate a valid

---

[91] Doc. 53-2.

[92] Doc. 53-4.

[93] *Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999) abrogated by *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002).

[94] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Case No. 1:14-CV-2612
Gwin, J.

rationale.[95/]  If that burden is met, the burden of production shifts back to the plaintiff to

demonstrate that the proffered reason is pretextual.

Defendants state the Plaintiffs were held on restricted-duty status because the BCI

investigation and prosecutorial review were on-going. Cleveland returned Plaintiffs to full duty

once the investigation and prosecutorial review were completed. This is a sufficient non-

discriminatory reason and it shifts the burden to require Plaintiffs to show pretext.

A Plaintiff can rebut a defendant's proffered non-discriminatory explanation by showing

that it was pretext. A Plaintiff shows pretext when the employer's reason either (1) has no basis

in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action.[96/]

Plaintiffs argue that Defendants' proffered reason has no factual basis since Plaintiffs

were switched from restricted duty to active duty on June 3, 2013 (and July 1, 2013 for Plaintiff

Rinkus) and then were returned to restricted duty on October 24, 2013.  Plaintiffs seem to say

that their June 2013 return to active duty prevents any later claimed need for restricted duty.

However, Police Chief McGrath testified that the return to full duty was a mistake and

that as soon as he realized the Plaintiffs were on full-duty, he ordered that they return to the

restricted duty positions.[97/] Plaintiffs do not show that Defendants' proffered non-discriminatory

reason is pretextual.

### B. Civil Rights Violation

Plaintiffs also claim that Defendants deprived Plaintiffs of their clearly established rights,

privileges, and immunities as secured by the Constitution and laws of the United States.  With

---

[95/] *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).
[96/] *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)).
[97/] Doc. 53-2 at 43-57.

Case No. 1:14-CV-2612
Gwin, J.

this civil rights claim, Plaintiffs say that Defendants violated their rights to equal protection by

unlawfully discriminating against Plaintiffs because they are white.  Plaintiffs bring this claim

under 42 U.S.C. §1983.

To show a violation of the Equal Protection Clause, Plaintiffs must show individual

discriminatory intent.  Plaintiffs must show that Defendants, and especially Police Chief

McGrath intended to discriminate against them because they are white.

Section 1983 claims can be made against political subdivisions such as Cleveland or can

be made against responsible individuals.  But equal protection claims under §1983 cannot be

based solely on the disparate impact of a facially neutral policy.  "Proof of racially discriminatory

intent or purpose is required to show a violation of the Equal Protection Clause."[98]

Plaintiffs sue Cleveland and former Police Chief McGrath.  McGrath made the restricted

duty decisions and, as police chief, his "edicts or acts may fairly be said to represent official

policy," and are attributed to the City.[99]

Because former Chief McGrath was positioned to establish City of Cleveland policy,

Cleveland becomes liable under *Monell* if Chief McGrath denies equal protection to the Plaintiff

Officers.  But Defendant Chief McGrath is only liable for his own acts, not for the acts of

others.[100]

A plaintiff making equal protection claims under § 1983 must show that the

---

[98]/ *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003).

[99]/ *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

[100]/ *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties." Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Case No. 1:14-CV-2612
Gwin, J.

discrimination was intentional.[101/] Because § 1983 liability requires personal defendant involvement, the "pattern-or-practice framework," does not fit the task of identifying which individual defendants engaged in purposeful discrimination. The Sixth Circuit has never recognized the pattern-or-practice framework to apply to §1983 discrimination claims against individual defendants. Thus, plaintiffs cannot use disparate impact theories to support claims against individual defendants.

But as discussed with regard to Plaintiffs' Ohio Chapter 4112 claims, Plaintiffs do not show any evidence that Police Chief McGrath or Cleveland assigned longer restricted duty because Plaintiffs were white.  In addition, Plaintiffs do not establish a protected property interest in overtime, court attendance pay or outside employment referrals.

*1. Plaintiffs due process claim loses because Plaintiffs do not have a legitimate property interest in secondary employment, overtime pay, court appearances, and transfers.*

To state a § 1983 claim, a plaintiff must allege that: 1) he was deprived of a right, privilege, or immunity secured by the Federal Constitution or laws of the United States, and 2) the deprivation was caused by a person while acting under color of state law.[102/] Plaintiffs lose at the first step of the inquiry.

Plaintiffs claim that they have a constitutionally protected property interest in working secondary employment and earning overtime and court time. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement

---

[101/] *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012).
[102/] *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005); *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 971 (6th Cir. 2004).

Case No. 1:14-CV-2612
Gwin, J.
to it."[103]

The Sixth Circuit has held that "[i]f an official has unconstrained discretion to deny the benefit, a prospective recipient of that benefit can establish no more than a 'unilateral expectation' to it."[104]  Thus Plaintiffs "can have no legitimate claim of entitlement to a discretionary decision."[105]  In order, for example, to claim a property interest in a promotion, Plaintiffs "must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the [City] to rescind the benefit."[106]

Plaintiffs do not satisfy this burden. The restrictive duty General Police Orders did not give more than a unilateral expectation to overtime benefits, outside employment benefits, or court time benefits.

*a. Secondary Employment*

The General Police Order dealing with secondary employment also gave the Police Chief and Public Safety Director wide discretion over secondary employment approvals.  The Order states, "upon written permission by the Chief of Police and the Director of Public Safety, Division members may engage in secondary employment if the work does not interfere with Division employment and there is no conflict of interest between the work and the Division. The Chief of Police or the Director of Public Safety may at any time revoke authorization to work secondary employment based upon the operational needs of the Division."[107] The Order gives the Chief and the Director discretion whether to authorize secondary employment. The order

---

[103] *Bd. of Regents v. Roth*, 408 U.S. 564, 577, (1972).
[104] *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409–410 (6th Cir.2002).
[105] *Richardson v. Township of Brady*, 218 F.3d 508, 517 (6th Cir.2000).
[106] *Med Corp. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002).
[107] Doc. 54-29 at 1.

-28-

Case No. 1:14-CV-2612
Gwin, J.

does not provide for any seniority preference for secondary employment.

   *b. Overtime*

   With regard to overtime, the Collective Bargaining Agreement between Plaintiffs and the City of Cleveland states that "the City shall be the sole judge of the necessity of overtime."[108] General Police Order 1.1.26 provides that "A superior officer shall verbally approve ALL requests for overtime and the use of compensatory time prior to a member working or taking off the time."[109] Further, General Police Order 9.1.03 states that Police Command Staff and Superior Officers' duties include the ability to "restrict their personnel's overtime to the minimum hours required to perform duties essential to meet Division needs" and to "limit overtime as stated above."[110] The orders do not require that seniority be considered in granting overtime.

   *c. Court appearances*

   As to court appearances, General Police Order 9.1.02 states that "Supervisors shall [a]pprove all in-house assignments, [including court appearances].[111]

   *d. Transfers and promotional exams*

   Finally, Plaintiffs do not allege any facts to show that they were not able to apply for transfers or to sit for promotional exams.

   All of these policies show that the Cleveland Police Department had discretion in assigning overtime,  Plaintiffs cite to no policy or evidence that limited the Cleveland Police Department's discretion in assigning overtime or approving outside work.

   *e. The CBA does not guarantee overtime or secondary employment*

---

[108]/Doc. 53-4 at 15.
[109]/Doc. 53-3 at 21.
[110]/Doc. 53-3 at 16.
[111]/Doc. 53-3 at 25.

Case No. 1:14-CV-2612
Gwin, J.

On this issue, the Plaintiffs say the Bargaining Agreement generally provides specified

overtime, court duty, off duty arrests, and call-in pay rates. Defendants respond that the benefits

were available, but the Cleveland Police Department kept discretion and never guaranteed

overtime, court duty, off duty arrests, and call-ins pay.  According to Cleveland, the Agreement

describes the pay but does not promise any assignment will be made. The Court agrees.

The Plaintiffs do not show a protected property interest in overtime assignments, in

outside employment approvals or in paid court appearance compensation.

*2. Plaintiffs' equal protection claim loses because Plaintiffs are not able to meet their burden in
proving a discrimination claim.*

Courts analyze §1983 equal protection claims under the framework governing Title VII

discrimination claims.[112] This Court has already reviewed Plaintiffs' Title VII discrimination

claim in Subsection A of this Opinion and Order and found that Plaintiffs are not able to meet

their burden under that framework. As such, Plaintiffs' §1983 equal protection claim also loses.

Although Chief McGrath was in a position as police chief to set municipal policy with

regard to the assignments, this Court has found that Plaintiffs did not suffer from a deprivation of

a constitutional right.

### C. Breach of Contract Claim

This Court does not have subject matter jurisdiction over Plaintiffs' breach of contract

claims. Ohio Rev. Code Section 4117.10(A) states, "An agreement between a public employer

and an exclusive representative entered into pursuant to this chapter, governs the wages, hours

and terms and conditions of public employment covered by the agreement. If the agreement

---

[112] *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir.2003).

Case No. 1:14-CV-2612
Gwin, J.

provides for a final and binding arbitration of grievances, public employers, employees, and employer organizations are subject solely to that grievance procedure."[113]

Here, Article XXII (51) of the CBA provides in gives a Grievance Procedure: "The term grievance shall mean any dispute arising out of or connected with the subject matter of this Contract or the interpretation, application or enforcement of any of its terms."[114] The Grievance Procedure says the Union may submit unresolved grievances to arbitration, with the arbitrators to be chosen in accordance with the rules of the American Arbitration Association.

Plaintiffs point to the 1969 Supreme Court case of *Glover v. St. Louis-San Francisco Railway Co.*, to argue that employees alleging racial discrimination should not be required to submit their controversy to a "group which is in large part chosen by the [defendants] against whom their real complaint is made."[115] However, the situation in *Glover* was vastly different than the one at hand. In *Glover*, the Plaintiffs did try to avail themselves of the CBA grievance procedures but were explicitly told by the bargaining agents that nothing would ever be done for them and to file a formal complaint would be a waste of time. The Plaintiffs in Glover were "completely frustrated in their efforts to present their grievance."[116]

The situation here differs markedly. There is no indication that Plaintiffs ever attempted to follow the grievance policy.[117] Plaintiffs did not follow any of the steps set up out in the CBA

---

[113]/Ohio Rev. Code Ann. § 4117.10.

[114]/Doc. 53-4.

[115]/*Glover v. St. Louis San Francisco Ry. Co.*, 393 U.S. 324, 330 (1969).

[116]/*Id.*

[117]/The CBA's grievance procedure sets out four steps. Under Step 1, Plaintiffs have seven days after the event giving rise to a grievance to reduce the grievance to writing and present it to the Commanding Officer of the Administrative Unit. Plaintiffs have the option of requesting a meeting with a representative designated by the Chief of Police. The grievance shall be answered in writing within seven days. If the grievance is not resolved under Step 1, Plaintiffs move to Step 2 and have seven days after receipt of the Step 1 answer to appeal to the Chief of Police. The Chief of Police then has seven days to respond. If the grievance is not resolved under Step 2, Plaintiffs can move to Step 3 and within seven days, appeal in writing to the Safety Director. The Director then must meet with the Union President

(continued...)

Case No. 1:14-CV-2612
Gwin, J.

and thus did not avail themselves of the available arbitration. Because the Collective Bargaining

Agreements required Plaintiffs to arbitrate or grieve employment disputes, this Court lacks

subject matter jurisdiction over the breach of contract claim.


## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary

judgment.

IT IS SO ORDERED.



Dated: December 8, 2015.                          s/          *James S. Gwin*
                                                  JAMES S. GWIN
                                                  UNITED STATES DISTRICT JUDGE

---

[117]/(...continued)
within twenty days and provide a written answer within twenty days. If the matter is not resolved under Step 3, Plaintiffs
move to Step 4, where the Union may submit the matter to arbitration within thirty days of receipt of the Step 3 answer.
Doc. 53-4.